**John P. DONOVAN, Appellant,**

v.

**John FRICK et al., Respondents.**

**No. 54643.**

Supreme Court of Missouri,
Division No. 1.

Sept. 14, 1970.

Motion for Rehearing or to Transfer to Court
En Banc Denied Oct. 12, 1970.

John G. Brannon, R. Brian Hall, North Kansas City, for appellant.

William B. Waters, Robert E. Coleberd, Arthur R. Kincaid, Liberty, for respondents Kincaid and Frick, Hale, Coleberd, Kincaid & Waters, Liberty, of counsel.

C. David Whipple, Kansas City, Conn Withers, Liberty, for respondents H. T. Walpole and Myra Walpole, Krings, Stewart, Whipple, Mauer & Eisler, Kansas City, of counsel.

WELBORN, Commissioner.

This is an appeal by a mortgagor from an adverse decree in his action to set aside a trustee's sale under a deed of trust. The trial court dismissed the petition and entered judgment for the purchaser at the trustee's sale on the purchaser's counterclaim for possession of the premises and for damages for the wrongful withholding of possession. Plaintiff-mortgagor appeals.

On December 5, 1962, John P. Donovan purchased a tract of land in Clay County described as "The East One-Half (E ½) of the Northwest Quarter (NW ¼) of Section Ten (10), Township Fifty-two (52) of Range Thirty-two (32)," from F. L. Thompson and his wife. The property was, at the time of purchase, encumbered with a mortgage to secure a loan from John Frick. Donovan entered into an arrangement with Frick whereby Donovan executed a new note and deed of trust, dated December 5, 1962. The note, in the principal sum of $12,000, due one year from date, was payable to John Frick, Robert Frick, James Frick and Nannie Frick as joint tenants. The finding of the trial court that John Frick acted as the agent of the other payees in all dealings with Donovan is not controverted. A deed of trust to the property involved was executed by Donovan to secure the indebtedness, with Arthur R. Kincaid as trustee.

Donovan took possession of the tract. When the principal fell due on December 5, 1963, Donovan was prepared to pay the principal. However, according to Donovan, John Frick had told him sometime previously that he was more interested in collecting the interest on the loan than the principal. Consequently, on December 9, 1963, Donovan took Frick a cashier's check for the interest then due, plus $15 which Frick had paid on closing costs, and Frick accepted the sum without question.

In April, 1964, Donovan sought an FHA home improvement loan to build a barn on the farm. When John Frick learned of this, he told Donovan that he would lend the $3,600 Donovan needed. Donovan asked whether he should sign a note and Frick told him that it would not be necessary, that he would make a notation on the check and that when the interest on the $12,000 loan came due in December, Donovan should also pay the interest on the $3,600 and after that make it part of the principal. Donovan received the $3,600 from Frick under the arrangement.

On December 8, 1964, Donovan paid Frick a year's interest on the $12,000 loan and interest on the $3,600 at 5% from the date of the loan to December 5, 1964. Donovan had not paid either the 1963 or 1964 taxes at that time and Frick reminded him to be sure and pay them, otherwise he would have to do so. Donovan paid the 1963 taxes in June, 1965.

In December, 1965, Donovan took Frick a check for $780, in payment of interest on the $15,600 indebtedness, due December 5, 1965. Frick accepted the check without reference to the principal, inquiring only about the payment of taxes. Donovan paid the 1964 taxes in August, 1966.

By December, 1966, Donovan had become involved in divorce proceedings which had resulted in a judgment for alimony in favor of his former wife. Donovan went to see Frick in December and told him of his difficulties. Donovan told Frick that he didn't have the money to pay the interest then due, but that he had some calves which he could sell. According to Donovan, Frick told him that he didn't think it

would be a good time to sell the calves, that they had a satisfactory arrangement and that he felt that Donovan would stand behind his word and that the interest would also draw interest and that Donovan should go ahead and see how it all turned out. Donovan told Frick that he was in the process of selling his interest in a corporation and that when he either did that or got his divorce straightened out, he would pay Frick. Frick was agreeable to this arrangement.

An execution was issued on the judgment against Donovan in the divorce case for $3,100 alimony in gross, $750 attorney's fees and $100 monthly alimony. The sheriff levied the execution on the farm and, on January 6, 1967, sold the farm at auction under the execution to one Walter J. Meiners for $7,700. Meiners is Donovan's brother-in-law and Donovan furnished the funds for Meiners' purchase. John Frick was present at the sheriff's sale and Donovan told him that Meiners was his brother-in-law and was buying it for Donovan with money Donovan got from the sale of calves the day before. Frick asked Donovan how he stood on the taxes and Donovan told him that he'd paid the 1964 taxes and that the 1965 taxes were unpaid. Frick said nothing about either the interest or principal on the loan.

In April, 1967, Donovan saw Frick at the "Coop" in Liberty. Donovan testified that, at that time, "Mr. Frick asked me if I had ever gotten my divorce straightened out, and I said that it was still pending on appeal, that the appeal that I had, was about to settle the business, I thought, transferring the stock, selling the stock in the corporation I owned, and I told him that the seventy-seven hundred dollars was still tied up in the sheriff's escrow account from the sheriff's execution sale. * * * He said, 'Are they still holding your money over there?' And I said, 'Yes,' and he said, 'Well, it's, I don't suppose they're paying you interest on it, are they?' And I said, 'No, I doubt it,' and he says, 'Well, the interest that you owe will draw interest

too, you understand that, don't you?' And I said, 'Yes, that I would have to pay you five per cent interest on the interest that had been due for approximately four months.' "

Glen Frick, the brother of John, was with his brother at the Coop on this occasion. He testified that he was with John while he talked to Donovan and that he heard no conversation about the indebtedness.

On June 30, 1967, Donovan mailed a check to the Clay County Collector in payment of the 1965 taxes on the farm. By letter of that same date, the collector returned the check to Donovan, informing him that Mr. Frick had paid the 1965 and 1966 taxes on June 23.

Donovan testified that he did not receive the letter from the collector until July 24, 1967. When he did get the letter, he went over to see Frick and Frick said: " 'Well, they sold that place today. Didn't you know about it?' And I said, 'No. What do you mean, they sold it?' And he said, 'Well,' he said, 'didn't Kincaid write you a letter or call you or anything?' And I said, 'No, I don't—what you mean, Kincaid or what?' And he said, 'Well, they had a sale and they sold it on the courthouse steps,' and he said, 'Didn't you know anything about it?' And I said, 'I didn't know one thing about it, John.' * * * I asked him who bought it, and he told me, Mr. and Mrs. Walpole, and the price of twenty thousand dollars; and I said, 'Well, how come they didn't say anything about it?' And he said, 'Well, I don't know. You'll have to talk to, have to talk to Kincaid.' * * * I said that I had just got my money out of that business, and I said, 'If I would have known you wanted your money in that type of situation in regard to collecting on the note or foreclosing on it, I would have paid you. I can pay you now.' * * * He said, 'I don't know, you'll have to talk to Kincaid.' "

On July 12, 1967, Donovan had received $21,000 in cash from the sale of his interest in a business and the settlement of a lawsuit involving that business.

By authorization of John Frick, Trustee Kincaid, who was also Mr. Frick's attorney, had begun advertisement of the trustee's sale under the deed of trust in the Liberty Tribune on June 29, 1967, and the notice appeared weekly for four issues of that publication. Donovan did not read the Tribune. Kincaid did not notify Donovan of the sale.

The sale was held on July 24 and H. T. Walpole was the only bidder. His bid of $20,000 was accepted and the property sold to him and a trustee's deed executed that date and filed for record July 28.

Following his conversation with Mr. Frick on July 24, Donovan went to see his attorney, Mr. John Brannon. He arrived at Brannon's residence at around 7:00 P. M. The next day, Brannon called Mr. Kincaid and told him that he planned to file suit to set aside the trustee's deed. Brannon and Kincaid did not agree on the details of their conversation. Brannon's recollection was that Kincaid said that the trustee's deed had not been delivered and that he was leaving for a vacation and would do nothing further until his return. Kincaid's recollection was that he did tell Brannon that he was leaving on a vacation, but that he told Brannon only that nothing would be done about the "overage" on the sale until he got back and that he would not be in a position to discuss the matter further until that time.

On August 4, the Walpoles filed an action in ejectment against Donovan. On August 7, Donovan filed his action to set aside the sale. The causes were consolidated and the Walpoles also filed a counterclaim in Donovan's action, seeking the relief they had previously sought in the ejectment action.

The trial court, upon a trial, dismissed Donovan's petition, entered judgment in ejectment in favor of the Walpoles and against Donovan, together with a judgment for rents and profits of $3,060, and judgment in favor of the Walpoles for $2,200 damages on account of a temporary injunction in favor of Donovan. Donovan has appealed.

Before the trial, John Frick suffered a stroke. Following a hearing on a motion for the appointment of a guardian ad litem, the trial court found Frick mentally incompetent and incapable of properly caring for his interest in the litigation and appointed a guardian ad litem. Robert Frick, one of the beneficiaries under the deed of trust, had died and was represented by an administrator. This situation produced numerous objections to testimony at the trial, based on the dead man's statute. The trial court did not rule the objections and took them with the case. The trial court was requested to make findings of fact and conclusions of law but failed to do so. The plaintiff did submit, after the decree had been entered, a motion to modify the judgment, accompanied by suggested finding of fact and conclusions of law, some of which the trial court accepted and some of which it rejected by replying "Yes" and "No" to the various propositions submitted. No point is here made by any party that the trial court erroneously considered or failed to consider evidence to which objection was made but not ruled, and we do not concern ourselves with any of these questions on this review.

■ On this appeal, the basic point of the appellant is that Frick's conduct had so lulled the mortgagor into a false sense of security in the belief that the mortgage would not be foreclosed without notice and prior demand that the right to foreclose without such demand and notice had been waived. The Fricks and Kincaid uphold the decree on the theory that the evidence did not support the contention of waiver and further on the theory that plaintiff had no standing to maintain the action because the sheriff's sale on execution had divested plaintiff of legal title to the prop-

erty. The Walpoles also assert this argument in support of the trial court's decree. They also assert that they were bona fide purchasers for value at the foreclosure sale, without notice of the claimed equities as between Donovan and the Fricks, and that such equities would, at best, render the sale voidable—not void—so they acquired legal title by virtue of the sale. We find the last stated contention dispositive and, therefore, turn to it.

Appellant has not seriously questioned the role of Walpole as a purchaser for value without knowledge of any circumstances as existing between the mortgagor and mortgagee which might have affected the validity of the sale. No evidence to contradict Walpole's testimony which would support such conclusion was presented on the trial. Appellant's brief has not questioned the trial court's finding that Walpole occupied such status. On oral argument in this court, appellant's counsel did refer to the fact that Walpole made the only bid submitted at the sale. Walpole testified that he was prepared to offer $20,000 for the property because he believed that it was worth that amount. The fact that his was the only bid submitted is no evidence of collusion or lack of good faith and our de novo review leads us to the conclusion reached by the trial court that Walpole was an innocent purchaser for value at the foreclosure sale.

Appellant's position is that, regardless of the status of Walpole, the foreclosure sale was void for lack of personal notice to him. He contends that the conduct of Frick had lulled him into the reasonable belief that the mortgage would not be foreclosed without demand having been made for payment, and that equity should set aside the sale because of the lack of actual notice to him. The principle invoked by appellant was stated as follows in Shumate v. Hoefner, 347 Mo. 391, 147 S.W.2d 640, 642[4]: " 'When the mortgagee lulls the owner of the equity of redemption into a sense of security and then forecloses the mortgage, without giving actual notice to the owner, courts of equity have uniformly set aside the foreclosure sales.' "

This principle has been applied frequently in cases where the owner seeks to redeem following a foreclosure sale at which the mortgagee or someone in his behalf is the purchaser. Among such cases are Clarkson et al. v. Creely et al., 35 Mo. 95; Alfred v. Pleasant, Mo.Sup., 175 S.W. 891, 892[4]; Laundy v. Girdner, Mo.Sup., 238 S.W. 788, 789[2]; Shumate v. Hoefner, supra; Ewing v. McIntosh, 359 Mo. 625, 222 S.W.2d 738, 741[2]; Starr v. Mitchell, 361 Mo. 908, 237 S.W.2d 123, 127[7]. See also Casper v. Lee, 362 Mo. 927, 245 S.W. 2d 132, 140[16, 17]. In Euge v. Blase et al., Mo.Sup., 339 S.W.2d 807, 810, and Farris v. Hendrichs, Mo.Sup., 413 S.W.2d 185, 188, the principle was recognized but held inapplicable because the facts failed to show that the mortgagee had lulled the owner into a sense of security. In none of those cases was the right of redemption sought to be enforced against an innocent purchaser for value at the foreclosure sale, without knowledge of the equities between the mortgagee and the owner. In the case of Daggett Hardware Co. v. Brownlee, 186 Mo. 621, 85 S.W. 545, a sale was set aside on the grounds of failure to notify the owner of the foreclosure after the holder of the note had agreed to do so. The purchaser was a third person. Nothing was noted in the opinion as to the purchaser's knowledge or lack of knowledge of the agreement between the mortgagee and the owner. However, the purchase price was also found inadequate. No evidence was offered in this case to show inadequacy of the purchase price. No claim to relief on that basis is asserted.

In Cassady v. Wallace et al., 102 Mo. 575, 15 S.W. 138, the sale was set aside as against a third person purchaser and his transferee. However, the purchaser, before paying the purchase price, became aware of the agreement by the mortgagee to notify the owner before undertaking

foreclosure. The transferee of the purchaser was likewise aware of the facts.

In the case of Rutherford v. Williams, 42 Mo. 18, the court recognized the rule applied in Clarkson v. Creely, supra. However, the mortgagee, who had purchased at a sale of which the owner had no notice, despite a promise not to proceed without letting the owner know, had subsequently sold the property to an innocent purchaser. The court held that the owner might have recovery against the mortgagee on the theory of breach of trust.

More recently a right of recovery on such theory for wrongful foreclosure was recognized in the case of Edwards v. Smith, Mo.Sup., 322 S.W.2d 770, 775[3]. In that case, the property had been sold at the foreclosure sale to a third person.

■ The right of action for damages, recognized in the Rutherford and Edwards cases, can hardly be considered as an alternative, in such situation, to the right to set aside the sale in equity. The intervention of rights of a third person limits the right to invoke the latter remedy. In the case of Beatie v. Butler, 21 Mo. 313, the court held that an innocent purchaser at a foreclosure was not affected by an agreement by the mortgagee at the time the mortgage was executed that the time of payment of the secured debt would be extended upon the payment of interest.

In the case of Schwarz v. Kellogg, Mo. Sup., 243 S.W. 179, 183[7], the court stated:

"It has long been settled law in this state that a purchaser for value at a trustee's sale will not be affected with any previous agreements between the creditor and the debtor unless he had notice of such agreements before his purchase."

See also Stewart v. Omaha Loan & Trust Co., 283 Mo. 364, 222 S.W. 808, 812[6].

■ In the case of Hrovat v. Bingham, 341 S.W.2d 365, the Springfield Court of Appeals stated the rules applied in the situation here presented as follows (341 S.W.2d 370–371):

*"As to the failure to give personal notice.* Under ordinary circumstances it is sufficient if the trustee gives the notice required by the deed of trust, and no personal notice is necessary to the holder of the equity of redemption or the junior lienholder. But there can be unusual circumstances under which common fairness would require a notice brought home to the owner or junior mortgagee, such as, for instance, when the mortgagee or the trustee has lulled the owner of the equity into a false sense of security. In such instances the failure to give notice could amount to a fraud. But where, as here, the debt secured was in default and the mortgagee had a clear right to foreclose, the insufficiency of notice would go to the voidability and would not render the foreclosure absolutely void. * * * [T]here is no indication that the purchaser at the foreclosure sale had knowledge of such state of affairs [as might give rise to a claim of 'lulling']. If an otherwise innocent purchaser at a foreclosure sale is required to run the risk of disability in title because of some 'off the record' transaction between the mortgagee and mortgagor, then the end result could very well be to depress the bidding at all future foreclosure sales with consequent injury to the mortgagor."

See Comment—"Mortgages-Redemption after Foreclosure Sale in Missouri," 25 Mo. Law Rev. 261, part V, "Lulling Mortgagor Into Sense of Security," pp. 272–274.

■ We conclude that since there was default in the obligations secured by the deed of trust, plaintiff is not entitled to set aside the sale as against an innocent third person for failure to give plaintiff personal notice of the foreclosure. In view of this conclusion, we do not consider the contention of respondents that the evidence, in no event, showed circumstances giving rise to a duty to give personal notice to plaintiff. Nor do we consider the effect

of the sheriff's sale upon the right of plaintiff to maintain this action.

The cases of West v. Axtell, 322 Mo. 401, 17 S.W.2d 328, and Judah v. Pitts, 333 Mo. 301, 62 S.W.2d 715, relied upon by appellant to show a breach of duty to him by the trustee do not support any claim of right to relief in this case. In West v. Axtell, supra, the mortgagor was afforded relief against a third-party purchaser by reason of dereliction of the trustee. However, involved in that case was a question of inadequacy of price and affirmative acts on the part of the purchaser to promote the sale. In Judah v. Pitts, supra, the sale was upheld. That case is of significance only for its reiteration of the general rules governing the duty of a trustee under a deed of trust. 62 S.W.2d 719–720[3–7].

Decree affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.